2015 VT 59











State v. Madigan (2013-242)

 

2015 VT 59

 

[Filed 17-Apr-2015]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 
 
 2015 VT 59
 
 


 


 
 
 No. 2013-242
 
 


 


 
 
 State of Vermont
 
 
 Supreme Court
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
 On Appeal from
 
 
 
 
      v.
 
 
 Superior Court, Bennington
 Unit,
 
 
 
 
  
 
 
 Criminal Division
 
 
 
 
  
 
 
  
 
 
 
 
 Charles Madigan
 
 
 October Term, 2014
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 Cortland
 Corsones, J.
 
 
 
 
  
 
 


Christina Rainville, Bennington County Chief Deputy State’s
Attorney, Bennington, for

  Plaintiff-Appellee.

 

Matthew F. Valerio, Defender General, and Anna Saxman,
Deputy Defender General,

  Montpelier, for Defendant-Appellant.

 

 

PRESENT:    Reiber, C.J., Dooley, Skoglund and
Robinson, JJ., and Hayes, Supr. J., 

                    
Specially Assigned

 

 

¶ 1.            
ROBINSON, J.   Defendant Charles (Hank) Madigan
appeals his conviction of three counts of lewd and lascivious behavior with a
child.  On appeal, defendant argues (1) that the trial court erred in
allowing two witnesses to testify to the victim’s character and reputation for
truthfulness; (2) that the trial court admitted impermissible hearsay; and (3)
that the prosecution’s closing argument was improper.  We reverse.

¶ 2.            
The testimony at trial reflected the following.  The victim, A.R.,
had been close friends with defendant’s daughter since early childhood.
 A.R. was somewhat estranged from her parents, who had divorced, and defendant
acted as a sort of a surrogate father to A.R.  After he and his wife
divorced, defendant and his daughter moved to a three-bedroom home at the goat
farm in Shaftsbury where defendant worked.  Soon after that, A.R.—then a
high school freshman—moved in with defendant and his daughter.  Defendant
supported A.R., providing furniture, food, and other items.  A.R., in
turn, performed farm chores.  A.R. moved out some time in her senior year.

¶ 3.            
The charges related to three incidents which A.R. described in her
testimony.  The incidents occurred in the summer between A.R.’s freshman
and sophomore years of high school.  A.R. testified that defendant bought
alcoholic beverages for her and was “hanging out” with her as they drank while
sitting on the couch watching television.  A.R. testified that this was
the first time she had drunk alcohol, and that she had two or three drinks.
 A.R. testified that she fell asleep on the couch and, some time later,
awoke in the dark and saw defendant “playing with” her pubic hair.  A.R.
testified that she pulled up her pajama bottoms and went to her bedroom and
closed the door.  She thought the incident “was so bizarre, so weird, that
I thought it could have been a dream or a hallucination. I just didn’t know.”
 A.R. did not mention what had occurred to anybody, and she stated that
she “purposely did not think about it,” because “it would have brought up too
many things to think about. Why did Hank do this? Why me?”

¶ 4.            
The second incident occurred sometime later that summer.  A.R.
testified that she was sleeping in her bedroom and woke to see defendant lying
next to her in her bed, fondling her breast or chest, pubic area, and buttocks.
 A.R. testified in some detail about the incident, stating that upon
awaking she moved away from him.  A.R. testified that “after that point, I
realized that . . . the first event really did happen, but I
didn’t know who to tell or if anybody would believe me.”  A.R. testified
that she feared that her friend would not believe her and that she would not be
able to stay at the farm had she come forward.  A third incident, later
that summer, was similar to the second, and on the fourth occasion she woke up
to find her hand on defendant’s penis.  Several days after the last
incident, A.R. asked defendant for a lock on her door, because she “was worried
that Hank would come in again.” A lock was installed very soon afterward, and
the incidents stopped.  A.R. testified that “we didn’t talk about what had
happened; life just went on.”

¶ 5.            
Later, during A.R.’s junior year, a close friend died, which had a
profound effect on A.R. and her friends.  A.R. became “very depressed”
throughout that year and the next.  A.R. continued living in defendant’s
home; she testified that she would check the lock multiple times before she
could sleep, every single night.  A.R. later left the farm and moved to
her father’s house.  A.R. testified that after her friend’s death, she
told another friend that she had been abused by defendant, and then soon after
told that friend’s sister.  A week or two later, a social
worker-investigator with the Vermont Department for Children and Families
contacted A.R., beginning the investigation which resulted in the prosecution
of defendant.  Defendant was convicted in a jury trial and now appeals.

I.  Testimony Concerning A.R.’s Character for
Truthfulness

 

¶ 6.            
Vermont Rule of Evidence 608(a) provides:

The
credibility of a witness may be attacked or supported by evidence in the form
of opinion or reputation, but subject to these limitations: (1) the evidence
may refer only to character for truthfulness or untruthfulness, and (2)
evidence of truthful character is admissible only after the character of the
witness for truthfulness has been attacked by opinion or reputation evidence or
otherwise.

 

¶ 7.            
The trial court permitted defendant’s ex-wife and A.R.’s friend, J.H.,
to testify concerning A.R.’s reputation for truthfulness.  In particular, the
state asked J.H.: “You know that there’s some kids who have a reputation for
lying, some kids who have a reputation for being truthful.  One way or the
other . . . did [A.R.] have a reputation?”  J.H. responded that:
“She was always very truthful.”  The court overruled defendant’s objection
to this testimony.  Similarly, when defendant’s ex-wife testified, the
prosecutor asked her essentially the same question.  Defendant’s ex-wife
replied that A.R. “is very truthful” and agreed that “she had a reputation as a
truthful kid.”

¶ 8.            
Defendant argues that allowing this testimony was error, both because
his defense did not attack A.R.’s character for truthfulness, thereby “opening
the door” to testimony concerning A.R.’s truthfulness, and because in both
cases the State failed to lay a sufficient foundation.

¶ 9.            
Defendant never asserted that A.R. outright lied, but did offer the jury
a narrative in which A.R. fabricated the accusations to get attention because
she was jealous of her friend’s success.  In opening argument, defense
counsel stated: “What happens with teenagers and girls is relationships split.
 Things change.  One girl becomes popular; one girl doesn’t.
 One girl is involved; one girl isn’t.  One girl remains in the
shadow; the other one blossoms.  And they see these things happening.
. . . [A.R.] was a senior in school going nowhere.  [Defendant’s
daughter] was going everywhere.  And what [A.R.] did is brought the
attention back to her.”

¶ 10.        
Additionally, defendant suggested that A.R.’s prior accounts were
inconsistent, unclear, or excessively delayed.  For example, defendant
offered testimony from A.R. to show that she could not recall, or may have been
equivocal, on precisely how long the gap was between incidents, and attempted
to show inconsistencies between what A.R. told investigators initially and what
she said later.  Specific issues that defendant addressed included whether
A.R. was given alcohol by defendant or took it for herself, whether A.R. had
been haying earlier in the day or did not remember what she did earlier in the
day, whether the drawstring pajamas she was wearing were tied or untied,
whether A.R. was wearing plaid pajamas or jeans at the time of an incident,
whether she was wearing a bra, the precise characterization of defendant’s
movements and how he was touching her, and what exactly A.R. had told her
friend, the first person she had ever told about the abuse.  Defendant
also questioned A.R. about her depression.

¶ 11.        
Defendant argues that the testimony he elicited at trial was impeachment
by prior inconsistent statements or by lack of memory, and that testimony “to
show that [A.R.’s] memory of these alleged incidents was vague and she changed
her story frequently” is not an attack on A.R’s character for truthfulness.
 The State argues that by attacking “every aspect” of A.R.’s testimony,
“including her mental health, her motives, her memory, the plausibility of [her
testimony], and her supposed inconsistencies,” defendant attacked A.R.’s
character for truthfulness.  We must decide, then, whether defendant made
an “attack” on the “character of the witness for truthfulness” within the
meaning of Rule 608.  This issue is one that has not been substantially
addressed by this Court.

¶ 12.        
The rationale for the general rule that “[t]he character of a witness
may not be supported until it has been attacked” is that “[i]t is thought that
the trier will assume that witnesses have normal character for veracity until
there is evidence to the contrary,” and “[i]t would be a waste of time and
money to put in good character evidence about witnesses whose character has not
been called into question.”  5 R. Park & T. Lininger, New Wigmore: A
Treatise on Evidence: Impeachment and Rehabilitation § 9.2 (2014). 
If character-for-truthfulness testimony was admitted “when there is only a
conflict in the testimony of opposing witnesses, the opposing witnesses on both
sides could be supported by sustaining testimony in regard to their standing
and character by reputation as witnesses, and the trial would be prolonged
indefinitely.”  Stevenson v. Gunning’s Estate, 64 Vt. 601, 609, 25
A. 697, 699 (1892).  “The purpose of Rule 608(a)(2) is to encourage direct
attacks on a witness’s veracity in the instant case and to discourage
peripheral attacks on a witness’s general character for truthfulness.”  United
States v. Dring, 930 F.2d 687, 690 (9th Cir. 1991).

¶ 13.        
The question of “what constitutes an ‘attack’ on the witness’s character
for truthfulness” is frequently a “murky” one.  4 J. Weinstein & M.
Berger, Weinstein’s Federal Evidence § 608.12[1] (2d ed. 2013)
[hereinafter 4 Weinstein].  Our rule is identical to its federal
counterpart.  Reporter’s Notes, V.R.E. 608 (“This rule is identical to
Federal and Uniform Rules 608.”); see F.R.E. 608(a)(2).  Where “our rule
is substantively identical to the federal rule,” we often “look to federal case
law in analyzing [its] meaning.”  Coles v. Coles, 2013 VT 36,
¶ 6, 193 Vt. 605, 73 A.3d 681.  The advisory committee’s note to the
federal rule discusses the kinds of evidence that qualify as an attack on the
character of the witness for truthfulness:

[Evidence
of] [o]pinion or reputation that the
witness is untruthful specifically qualifies as an attack under the rule, and
evidence of misconduct, including conviction of crime, and of corruption also
fall within this category. Evidence of bias or interest does not. Whether
evidence in the form of contradiction is an attack upon the character of the
witness must depend upon the circumstances.

 

Advisory Committee’s Note – 1972
Proposed Rules, F.R.E. 608 (citations omitted).

¶ 14.        
Consistent with that guidance, courts generally decline to allow
evidence of a witness’s reputation for truthfulness in response to mere
evidence of bias or interest.  Such evidence “undermines the veracity and
credibility of the witness . . . without implicating the witness as a
liar in general.”  Dring, 930 F.2d at 691.  For example,
evidence that a witness in the case is a party’s relative would not open the
door to rehabilitative testimony to support witness’s character for
truthfulness—even though the clear implication is that the witness might lie
for his relative’s benefit—because the attack is not made against the witness’s
“character for truthfulness” generally.  Id.  By contrast,
when a party suggests that a witness has a predisposition for untruthfulness
and invites the jury “to infer that the witness is lying at present, simply
because he has lied often in the past,” this constitutes an attack on character
for truthfulness sufficient to open the door to rehabilitation testimony.
 Id.

¶ 15.        
Impeachment by contradiction—including an emphasis on inconsistencies in
a witness’s testimony or inconsistencies between the testimony of different
witnesses—also usually does not constitute an attack on a witness’s character
for truthfulness. 4 Weinstein, supra, § 608.12[4][a] &
n.13 (collecting cases). We recognized this distinction more than a century ago. 
Gunning’s Estate, 64 Vt. at 608, 25 A. at 699 (“It is observable that a
distinction is taken between an attack upon the character of the witness as
such for credibility, and the character of the testimony, given for belief
. . . .  [T]he character of the testimony given by a
witness does not directly attack the character of the witness for credibility.”
(emphasis omitted)).  Such contradiction on specific matters is not
usually viewed as sufficiently related to a witness’s general predisposition to
constitute an attack on character for truthfulness.  4 Weinstein, supra,
§ 608.12[4][a].  This is true even if the impeachment by
contradiction consists of “[v]igorous cross examination, including close
questioning of a witness about [the witness’s] version of the facts and
pointing out inconsistencies with the testimony of other witnesses.”[1]  Dring, 930 F.2d at 691-92.

¶ 16.        
On the other hand, “[a] slashing cross-examination may carry strong
accusations of misconduct and bad character, which the witness’s denial will
not remove from the jury’s mind.”  Id. (quoting E. Cleary,
McCormick on Evidence § 49, at 117 (3d ed. 1984)).  For that reason,
“[i]f . . . fairness requires it, [the judge] may permit evidence of
good character, a mild palliative for the rankle of insinuation by such
cross-examination.”  Id. (quoting Cleary, supra, § 49,
at 117).

¶ 17.        
 Several considerations inform the analysis of whether impeachment
by contradiction has called into question a witness’s general character for
honesty.  One “is whether the inconsistency or contradiction relates to a
matter on which the witness could be innocently mistaken,” or whether the
inference is that the witness is lying.  2 K. Broun, McCormick on
Evidence § 47 (7th ed. 2013).  “Another pertinent consideration is
the number of inconsistencies mentioned by the cross-examiner.  The larger
the number, the stronger is the inference that by character the witness is a
liar, not simply a witness who has told an isolated lie.”  Id.
(citing State v. Eugenio, 579 N.W.2d 642, 648-49 (Wis. 1998)
(holding evidence of witness’s truthful character admissible only when court
determines “that a reasonable person would consider the attack on the witness
to be an assertion that the witness is not only lying in this instance, but is
a liar generally”)).  The critical question is whether the attack on the
witness’s credibility suggests that the witness is lying in this case,
or whether it goes further and attempts to show that the witness has a general
character for dishonesty.  See Dring, 930 F.2d at 692 n.6.

¶ 18.        
For these reasons, the bar against Rule 608(a) rehabilitation testimony
in response to attacks on a witness’s credibility is high.  For example,
in State v. Carr, the defendant’s wife testified on behalf of her
husband, who was charged with committing sex crimes against one of his
stepdaughters.  725 P.2d 1287, 1288-89 (Or. 1989).  The defendant’s
wife testified that the daughters were “rebelling right now” against their
parents’ attempts to impose discipline.  Id. at 1289.  When
asked whether she was “trying to tell the jury that
those two children are lying because they don’t like the way you discipline
them?” she responded, “Yes, I am.”  The wife was then asked, “You’re
telling this jury, are you not, that what [the children] said is not true?” and
she responded “Yes, I am.  All of it is not true.  All of it.”  Id. 
The Oregon Supreme Court held that even this flat assertion that the children
were lying was not an attack on the character of the witnesses, because,
“testimony suggesting a motive of the victim to lie” does not raise the
“issue of the truthful character of the victim” generally.  Id. at 1290.

¶ 19.        
Similarly, in Eugenio, defense counsel “highlighted several
inconsistent statements made by the victim concerning the circumstances
surrounding her alleged sexual abuse” in opening statement and
cross-examination, stated that “repeating a lie doesn’t make it true,” and
suggested that the victim was lying for attention.  579 N.W.2d at 646-47.
 The Wisconsin Supreme Court held that this strategy was not an attack on
the victim’s character for truthfulness because “allegations of a single
instance of falsehood cannot imply a character for untruthfulness just as
demonstration of a single instance of truthfulness cannot imply the character
trait of veracity,” and a party may “attack the veracity of a witness’s
statements, and the intent or motive with which the witness makes the
statements, without calling into question the general character of a witness
for truthfulness.”  Id. at 648.

¶ 20.        
Likewise, the New Hampshire Supreme Court found in a sexual-assault case
that the character for truthfulness of the witness-alleged victim was not
attacked even where “the defendant questioned the complainant extensively about
her pending civil suit against him” and “argued to the jury that the criminal
prosecution was ‘about money,’ that money was ‘what she’s after.’ ”  State
v. Ross, 685 A.2d 1234, 1237 (N.H. 1996).  The court held that such an
attack was an “attempt to demonstrate bias or interest” and “did not amount to
an attack on the complainant’s general character for truthfulness,” and thus
the admission of two witnesses’ testimony on “the complainant’s truthful
character” was improper.  Id.  See also Michael v. State,
235 S.W.3d 723, 724-28 (Tex. Crim. App. 2007) (holding, in child sex-abuse
case, that impeachment of alleged victim with prior inconsistent statements to
child-welfare workers did not “necessarily impugn[] . . . character
for truthfulness”); State v. Siegel, 50 P.3d 1033, 1039-40 (Idaho Ct.
App. 2002) (holding, in child sex-abuse case, that prosecution’s suggestion
that defendant’s testimony was self-serving was not attack on his character for
truthfulness).  Cf. United States v. Lukashov, 694 F.3d 1107, 1117
(9th Cir. 2012) (holding, in child sex-abuse case, that alleged victim’s
character for truthfulness was attacked where defendant’s entire strategy “from
opening statement through closing argument” was to “not merely point out
inconsistencies,” but to depict alleged victim as “a liar” who had been
directed by her mother to lie and who had given false evidence “not only
. . . on the witness stand at trial, but . . . from the
beginning,” to police, physician, and child-welfare worker).

¶ 21.        
Under this stringent standard, we cannot find that defendant attacked
A.R.’s character for truthfulness.  Accordingly, the admission of
testimony on A.R.’s character for truthfulness was improper under Rule
608(a).  In suggesting that A.R. was jealous and made the accusations in
this case to get attention, defendant undoubtedly called into question A.R.’s
honesty concerning the allegations in this case.  But defendant did not
mount a broader attack on A.R.’s character for truthfulness.  Nor did
defendant’s strategy of exposing inconsistencies in A.R.’s testimony amount to
an assault on her general character for truthfulness.  Defendant closely
questioned A.R., but the clear focus was on allegedly inconsistent statements
made by A.R., and on A.R.’s lack of memory and potential confusion on certain
points.  We find that defendant’s suggestion that A.R.’s testimony was
inaccurate or unreliable falls into the category of routine attempted impeachment
by contradiction, and thus the admission of rehabilitation testimony on her
good character was error.  Were we to hold otherwise, the exception would
swallow the rule.  See Pierson v. Brooks, 768 P.2d 792, 796 (Idaho
Ct. App. 1989) (“It cannot be gainsaid that identification of . . .
inconsistencies may reflect incidentally upon a witness’s credibility. However,
if this incidental effect were deemed to constitute an attack upon the
witness’s character . . . then the rule would be swallowed by its own
exception.”).

II.  Hearsay

¶ 22.        
Defendant next challenges the trial court’s decision to allow A.R.’s
friend J.H. to repeat to the jury statements A.R. made to her accusing
defendant.  The following colloquy occurred during the State’s examination
of J.H:

 
[PROSECUTOR]: Did you ask her about moving out . . . of Hank’s
place?     

 

 
[J.H.]: Yes.

 

 
. . . .

 

 
[PROSECUTOR]: . . . So she tells you, I’m moving out.  What did
you say?

 

 
[J.H.]: I asked her why she was moving out.  She was living there for
years.

 

 
[PROSECUTOR]: And what did she say to you?

 

 
[J.H.]: She said that she had been sexually abused by Hank.

 

 
[PROSECUTOR]: Now, did she say anything else in that conversation?

 

 
[J.H.]: She said that she had a lock on her door that she tried to keep locked
at night.  She was afraid to have it unlocked.

 

¶ 23.        
Defendant argues that the admission of this evidence is inadmissible
hearsay.  V.R.E. 802.  Defendant promptly objected to this testimony
at trial on these grounds, both before it was given, when the prosecutor made a
proffer, and after it was offered.  The State argued at trial that these
the statements fell under the Rule 803(3) exception to the rule against
hearsay, and the trial court overruled defendant’s objection.[2]

A.     Rule
803(3)

 

¶ 24.        
V.R.E. 803(3) provides, in relevant part, that “[a] statement of the
declarant’s then-existing state of mind, emotion, sensation, or physical
condition (such as intent, plan, motive, design, mental feeling, pain and
bodily health), but not including a statement of memory or belief to prove the
fact remembered or believed” is not excluded by the general rule against
hearsay embodied in V.R.E. 802.  This exception is part of a family of
exceptions, which includes Rule 803(1) (present sense impressions) and Rule
803(2) (excited utterances), that are admissible because they are “made in
circumstances of spontaneity that supply the necessary element of
trustworthiness.”  Reporter’s Notes, V.R.E. 803; see also 2 Broun, supra,
§ 274 (“[T]he special assurance of reliability for statements of present
state of mind rests upon their spontaneity and resulting probable sincerity.
 The guarantee of reliability is assured principally by the requirement
that the statements must relate to a condition of mind or emotion existing at
the time of the statement.” (footnote omitted)).

¶ 25.        
For a statement to fall within the Rule 803(3) exception, “[t]he
proponent must show that: (1) the statement was contemporaneous with the mental
state to be proved, (2) the declarant had no time to fabricate or misrepresent
thoughts, and (3) the state of mind is relevant to an issue in the case.” 
State v. Verrinder, 161 Vt. 250, 258, 637 A.2d 1382, 1388 (1993)
(quoting United States v. Carter, 910 F.2d 1524, 1530 (7th Cir.
1990)).  Rule 803(3) is commonly used to demonstrate fear, in such
contexts as extortion prosecutions because fear is an element of extortion, and
sexual-assault cases where statements of fear made to third parties may assist
in proving lack of consent.  2 Broun, supra, § 274 n.20;
Mueller & Kirkpatrick, supra, § 8.38, at 849-50 (discussing use
in extortion context); see also State v. Newell, 710 N.W.2d 6, 18-19
(Iowa 2006) (victim’s statements to several other people that she was scared of
defendant, wished to leave him, and feared for her safety were relevant “to
rebut the defendant’s position that he and the victim had a loving
relationship”).  An important limitation, however, is that the mental or
emotional condition sought to be shown, “such as fear, must be relevant other
than to prove the events giving rise to the fear.”  2 Broun, supra,
§ 274 n.20.

¶ 26.        
By contrast, J.H.’s testimony—that A.R. told her that defendant had
sexually abused her, that she had locks on her door, and that she was afraid to
leave the door unlocked—was introduced not to show the victim’s state of mind
generally, but “to prove the fact remembered or believed.”  Such “backward-looking statements of memory or belief
are excluded because . . . [they] present the classic hearsay dangers
of memory and narration.”  2 Broun, supra, § 276;
5 J. Weinstein & M. Berger, Weinstein’s Federal Evidence,
§ 803.05[2][b] (2d ed. 2013) (except in will cases, statement of memory or
belief inadmissible to prove “earlier acts”).  As one court has stated:

[T]he
state-of-mind exception does not permit the witness to relate any of the
declarant’s statements as to why he held the particular state of mind, or what
he might have believed that would have induced the state of mind.  If the
reservation in the text of the rule is to have any effect, it must be
understood to narrowly limit those admissible statements to declarations of
condition—“I’m scared”—and not belief—“I’m scared because Galkin threatened
me.”

 

United
States v. Cohen, 631 F.2d 1223, 1225 (5th Cir. 1980)); see also United
States v. Taubman, 297 F.3d 161, 164-65 (2d Cir. 2002) (per curiam)
(holding that trial court properly excluded testimony by defendant’s assistant,
which would repeat statements purportedly made by defendant following a meeting
related to charged conspiracy, because Rule 803(3) exception does not apply to
statements “about a meeting that had already happened”); United States v.
Cardascia, 951 F.2d 474, 486-88 (2d Cir. 1991) (holding that
backwards-looking statements in resignation letter stating that writer had
disagreed with company’s extension of loan to defendant were properly excluded,
because Rule 803(3) does not permit state-of-mind evidence in order to “provide
an inference of the happening of an event that produced the state of mind”).
 In sum, the State here offered just the sort of evidence that Rule 803(3)
does not allow.

B. 
“Fresh-complaint doctrine”

 

¶ 27.        
The State urges, as an alternative to Rule 803(3), that this Court
affirm the evidentiary ruling on the basis of the “fresh-complaint
doctrine.”  This evidentiary doctrine—also known as the “report-of-rape,”
“prompt-outcry,” or “first-complaint” rule, among other names—is an exception
to the ordinary rule that “bolstering” hearsay testimony of a witness’s prior
consistent statements is inadmissible.  The doctrine is a vestige of a
time when corroboration was a required element of rape, and evidence of a
complaint soon after the crime occurred served “to explain an apparent
inconsistency arising from the woman’s failure, at the time of the alleged
rape, to tell someone of the crime when society perceives that it would have
been natural for her to do so.”  Battle v. United States, 630 A.2d
211, 216 (D.C. 1993) (tracing history of corroboration requirement and
“report-of-rape” rule).  In essence, the fresh-complaint doctrine
ameliorated the presumption that jurors would find claims of sexual assault
inherently untrustworthy.  See, e.g., State v. Woodard, 769 A.2d
379, 384 (N.H. 2001) (noting that the “doctrine of fresh complaint
. . . was based on the presumption that a sexual assault victim would
immediately confide in someone and that if no complaint was made, it could be
assumed that no assault occurred”).  The question of whether Vermont
recognizes the “fresh-complaint doctrine” was expressly reserved in State v.
Fellows, 2013 VT 45, ¶ 22, 194 Vt. 77, 76 A.3d 608.

¶ 28.        
While a few courts have adopted this rule in modified form,[3] “[m]ost courts no longer recognize this
theory,” Black’s Law Dictionary 782 (10th ed. 2014), and the idea of a doctrine
as a distinct rule in derogation of the rules of evidence is largely a
“historic artifact.”  2 Broun, supra, § 272.1
(contrasting fresh-complaint rule with “modern practice”).  We reject the
“fresh-complaint rule” as an independent evidentiary doctrine because the
doctrine has been largely supplanted by rules of evidence.  Rather than
having a freestanding evidentiary doctrine apart from the rules of evidence,
most courts sensibly prefer to apply the same rules of evidence in sexual-abuse
cases as in other cases.  Courts frequently and properly evaluate evidence
of a victim’s past out-of-court statements, including statements that would
fall within the “fresh-complaint” doctrine advocated by the State, under the
ordinary rules of evidence.  In some cases, the statements are not hearsay
because they are not offered to prove the truth of the matter asserted, but
rather are offered for other purposes, such as a prior consistent statement
offered to rebut a charge of recent fabrication, Rule
801(d)(1)(B),[4] or evidence to establish the timing or
circumstances of a report rather than the truth of the claim reported.[5]
 In other cases, the statements are
admissible pursuant to an exception to the general prohibition of hearsay, such
as the exceptions for excited utterances, V.R.E. 803(2), statements made
for purposes of medical diagnosis or treatment, V.R.E. 803(4),[6] and certain out-of-court statements made
by children who are twelve years of age or under and who are the putative
victims of abuse, neglect, or certain sexual crimes.  V.R.E. 804a(a).[7]  We join those courts that have
declined to apply a separate “fresh-complaint exception” to the hearsay rule,
while recognizing that the evidence sought to be admitted pursuant to the
fresh-complaint doctrine is often, though not always, admissible under our
modern rules of evidence.  See, e.g., Brown, 883 P.2d at 950
(noting that “generally applicable evidentiary standards” adequately serve goal
of ascertaining truth); Browne v. State, 132 So. 3d 312, 316
(Fla. Dist. Ct. App. 2014) (finding that “adoption of
the Florida Evidence Code eliminated any common law hearsay exceptions not
codified” and that common-law fresh-complaint rule is no longer a valid
exception to prohibition on admitting hearsay testimony); State v.
Robinson, 989 A.2d 965, 979 (R.I. 2010) (evaluating out-of-court statements
in child-abuse case under ordinary hearsay rules rather than fresh-complaint
doctrine).

III.  State’s
Closing Argument

 

¶ 29.        
Finally, defendant challenges the State’s closing argument.  The
prosecutor, in her principal closing argument, described to the jury A.R.’s
family’s relative material privation and the benefits she enjoyed living on
defendant’s farm as a way of explaining why A.R. stayed in defendant’s home
after the alleged incidents. In the State’s rebuttal closing argument, the
prosecutor went further, stating:

 
[PROSECUTOR]: Questions . . . [that the defense] raised about, you
know, she could work at the farm in Shaftsbury if she moved out? 
Huh?  She’s [fourteen].  How is she going to get there?  Her mom
lives in Bennington.  She’s going to work on a farm in Shaftsbury?  I
mean, that’s nonsensical.  And think, again, what it would be like to be
[A.R.].  Poor.

 

 
[DEFENSE COUNSEL]: Judge—

 

 
[PROSECUTOR]: Maybe hungry.

 

 
[DEFENSE COUNSEL]: —I think it’s improper.  We’ll object.

 

 
[THE COURT]: Overruled. I think it’s based on the evidence.

 

 
[PROSECUTOR]: People who are poor and need housing subsidies.  Maybe she’s
hungry. We don’t know.  We didn’t hear testimony about that. But all she
owned was a couple [of] books.  That’s her life possessions at age
[fourteen].  And she’s supposed to give up everything to tell, even though
the abuse [has] stopped.  It makes no sense at all.  The lock. 
You know what’s important about the lock?  The lock is when she said
no.  That’s what it was.

 

¶ 30.        
“The longstanding rule in Vermont is that
counsel should confine argument to the evidence of the case and inferences properly drawn from it.”  State v.
Lapham, 135 Vt. 393, 406, 377 A.2d 249, 257 (1977).  While counsel
“are entitled to a good deal of latitude in their closing arguments, they are
‘bound to keep within the limits of fair and temperate
discussion . . . circumscribed by the evidence in the
case.’ ”  State v. Rehkop, 2006 VT 72, ¶ 35, 180 Vt. 228, 908 A.2d 488 (quoting State v. Hannett,
54 Vt. 83, 89 (1881)).  This obligation is a particularly essential one
for prosecutors.  Although prosecutors
must “present the State’s case with earnestness and vigor,” they also have a
“corresponding duty to refrain from improper
methods . . . and to guard against conduct unintentionally
trespassing the bounds of propriety.”  Lapham, 135 Vt. at 406, 377
A.2d at 257.

¶ 31.        
Viewed in their entirety, the prosecutor’s
statements—exhorting the jury to imagine “what it would be like to be
A.R. . . . poor . . . maybe
hungry”—exceeded the bounds of fair and temperate
discussion, circumscribed by the evidence and inferences properly drawn
therefrom. By the prosecutor’s own admission, there was no testimony presented
at trial that A.R. was “hungry,” and the bald invitation for the jury to
consider this speculation was improper.  The effect of such statements was
not only to interject facts of little or no relevance to defendant’s guilt or
innocence, but also to prejudicially play upon the jurors’ natural
sympathy for the victim, a risk made more potent by the prosecutor’s
exhortation to the jury to “think, again, what it would be like” to be A.R.
 “This Court has often condemned arguments made to the jury in which the
prosecutor makes inflammatory statements or appeals to the sympathies of the
jury.”  State v. Bubar, 146 Vt. 398, 403, 505 A.2d 1197, 1200
(1985); Duchaine v. Ray, 110 Vt. 313, 321, 6 A.2d 28, 32 (1939) (noting that
counsel’s urging of jurors to place themselves in victim’s shoes was a “highly
improper,” “lamentable departure” from rule against appeals to jurors’
prejudice).[8]

IV.  Prejudice

 

¶ 32.        
The fact that the challenged evidence of A.R.’s reputation for truthfulness
and the challenged hearsay evidence were improperly admitted, and that the
State’s closing argument was improper, does not end our inquiry.  When the
admission of evidence, exclusion of evidence, or propriety of argument is
objected to in the trial court and raised on appeal, we review for harmless
error, determining whether (1) the ruling was erroneous, and (2) if so, whether
“a substantial right” of defendant was affected.  V.R.E. 103(a); see also
V.R.Cr.P. 52(a) (“Any error, defect, irregularity or variance which does not
affect substantial rights shall be disregarded”); State v. Herring, 2010
VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81 (“In the event of error, we may
nevertheless uphold a conviction ‘if we find that the error was harmless beyond
a reasonable doubt.’ ” (quoting State v. Lipka, 174 Vt. 377, 384,
817 A.2d 27, 33 (2002)); State v. Hemingway, 148 Vt. 90, 92, 528 A.2d
746, 748 (1987) (reviewing closing argument for harmless error).

¶ 33.        
Here, we cannot say beyond a reasonable doubt that the erroneous
admission of the evidence and the improper closing argument were
harmless.  A.R. was clearly the State’s star witness, and the only witness
to the alleged offenses.  The State relied heavily on A.R.’s testimony in
closing argument, and the jury’s belief in A.R.’s credibility must have been
pivotal.  It is reasonably possible that the testimony of two vouching
witnesses on A.R.’s truthful character, as well as the testimony of one of them
essentially repeating her accusation against defendant, may have affected the
verdict.  See State v. Blair, 155 Vt. 271, 276, 583 A.2d 591, 594
(1990) (finding, in sexual-assault case that “was a credibility contest between
the victim and the defendant,” that “[w]e cannot say that a third party’s
opinion of the credibility of the victim could not have tipped the scales such
that defendant would have been acquitted”).  The prosecutor’s closing
argument furthers our belief that the combined errors could not be harmless.
 See State v. Percy, 146 Vt. 475, 486, 507 A.2d 955, 961 (1986)
(finding that “cumulative effect of” improper admission of evidence and
prosecutor’s improper remarks in closing argument “necessitates reversal”).[9]

Reversed and remanded for further proceedings.


 
 
  
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate
 Justice
 
 


 














[1]  Even aggressive impeachment by contradiction
frequently calls into question “the ability of the witness to perceive or
recall certain facts due to excitement, fatigue, poor eyesight, poor lighting,
great distance from the event in question, or fading memory affected by the
passage of time,” and does not necessarily imply dishonesty in a specific
instance, let alone a general character for dishonesty.  Dring, 930
F.2d at 691 n.5; C. Mueller & L. Kirkpatrick, Evidence § 6.50, at 566
(4th ed. 2009) (impeachment by contradiction frequently does “not so much
suggest untruthfulness as forgetfulness or lack of perception or judgment”);
see also State v. Tierney, 839 A.2d 38, 45 (N.H. 2003) (an attack on
credibility is not an attack on “general character for truthfulness”).





[2]
 The State asserts, in a single line of its brief, that “the objection was
waived and is now subject to plain-error review” because “this evidence was not
objected to at the time of J.H.’s testimony.”  We are puzzled by this
assertion.  Defendant objected to the testimony on specific grounds in a
sidebar with the prosecutor and the judge, arguing that Rule 803(3) did not
apply.  Although the exchange between the court and counsel was brief,
there is no doubt that this was a timely and specific objection as needed to
preserve the issue under V.R.E. 103(a)(1).  See Billings v. Billings,
2011 VT 116, ¶ 14, 190 Vt. 487, 35 A.3d 1030 (noting that where objection
and evidence at issue was “specifically identified, and the court was aware of
its substance,” issue is preserved).





[3]
 See 2 Broun, supra, § 272.1 n.8 (noting that a minority
of states follow modified version of doctrine); see also Battle, 630
A.2d at 221-22 (D.C. 1993); Commonwealth v. King, 834 N.E.2d 1175,
1197-98 (Mass. 2005); State v. Hill, 578 A.2d 370, 377-80 (N.J.
1989).  These courts significantly differ on the application of the
doctrine.  For example, some allow only testimony as to the fact of the
complaint, see Hill, 578 A.2d at 378, while others allow details of the
complaint to be admitted, see King, 834 N.E.2d at 1197.





[4] 
E.g., Monday v. State, 792 So. 2d 1278, 1281-83 (Fla. Dist. Ct. App. 2001)
(victim-witness’s prior consistent statement was admissible for rehabilitation,
because it could be useful to jury for credibility finding); James v.
Commonwealth, 360 S.W.3d 189, 205-07 (Ky. 2012) (prior consistent
statements of victim to detective admissible to rehabilitate credibility, not
as substantive evidence); State v. Young, 743 A.2d 1275, 1277-81 (N.H.
1999) (victim’s prior consistent statements were admissible to rebut
defendant’s allegation of victim’s improper motive to fabricate the occurrences
of sexual assault); Tombroek v. State, 2009 WY 126, ¶¶ 5-13, 217
P.3d 806 (physician’s testimony on two statements made by victim identifying
the individual who had sexually assaulted her were admissible as prior
consistent statements).

 





[5] 
See, e.g., People v. Brown, 883 P.2d 949, 960 (Cal. 1994); Woodward,
769 A.2d at 384.

 





[6]
 E.g., State v. Slater, 908 A.2d 1097, 1099, 1101-08 (Conn. App.
Ct. 2006) (victim’s statements to strangers and to emergency-room staff were
excited utterance and statement for purposes of medical treatment,
respectively); State v. Neitzel, 801 N.W.2d 612, 621-22 (Iowa Ct. App. 2011) (victim’s
statements admitted under the hearsay exception for statements made for the
purposes of medical diagnosis or treatment); Medina
v. State, 143 P.3d 471, 473-75 (Nev. 2006)
(victim’s statement to neighbor was excited utterance); State v.
Stahlnecker, 690 S.E.2d 565, 572-73 (S.C. 2010) (victim’s statement to
mother was excited utterance); State v. Ladner, 644 S.E.2d 684, 690-93
(S.C. 2007) (victim’s statement to caretakers was excited utterance); State v. Smith, 909
P.2d 236, 238-41 (Utah 1995) (statement by
victim to investigator was excited utterance); State v. Huntington, 575
N.W.2d 268, 272-74, 277-78 (Wis. 1998) (statements to investigator were exited
utterance and victim’s mother’s statements to nurse were statements for
purposes of medical treatment).  Cf. State
v. Cagley, 638 N.W.2d 678, 680-82 (Iowa
2001), People v. Hackney, 455 N.W.2d 358, 360-64 (Mich. Ct. App. 1990)
(both evaluating victims’ statements and finding that hearsay exceptions did
not apply under facts of case).

 





[7]
 If we were to adopt a new freestanding doctrine allowing the admission of
the out-of-court statements of A.R., who was around sixteen at the time the
statements were made, it would conflict with the exception to the hearsay
prohibition for certain reports of sexual and other abuse by children, which is
limited to children aged twelve or under.





[8] 
Although not material to our judgment, we also express our displeasure with the
State’s decision to include in its briefs inflammatory material from outside
the record.  The State’s brief refers to testimony by defendant’s
stepdaughter at the sentencing hearing that she, too, had been abused by
defendant.  The State’s brief also refers to another alleged victim, who
did not testify at trial and whose statements would be inadmissible hearsay in
any case.  Both topics are irrelevant to any issue in this appeal. 
Such extraneous material is unhelpful to the Court’s decisionmaking and does
not belong in filings before this Court.  See V.R.A.P. 28(a)(3) (statement
of the case in briefs should address “the subject of the litigation, the claims
of the parties, the facts of the case and proceedings below”).  Any future
brief containing irrelevant material may be struck in whole or in part.  Napro
Dev. Corp. v. Town of Berlin, 135 Vt. 353, 355, 376 A.2d 342, 345 (1977)
(granting motion to strike materials “not properly before us because they are
not part of the record” and “will not be considered on review”).





[9]
 Because we conclude that the trial court improperly admitted testimony
concerning A.R.’s character for truthfulness, and reverse in part on that
basis, we need not reach the question of whether the State laid sufficient
foundation for the testimony.